The last argument for today is in Case No. 24-2356, United States v. Israilov. Mr. Donovan? May I please quote? My name is Jeremiah Donovan. I wasn't the attorney below, but Your Honors appointed me on appeal. And unlike so many other cases in which you appoint me on appeal, this one presents some kind of interesting issues, I think. I think the most interesting issue here, and the one that I'll probably concentrate in the argument on, is the question of whether companies, you know, there's a state court case, Mayella, that says that if a company provides services that entitles it to insurance payments, unless that company is owned by doctors, they're not entitled to any insurance payments. And the district court said that every bit of money that the insurance companies pay to these entities that were not owned by doctors, every bit of that should be paid in restitution. And what Israilov said was, no, I mean, a lot of the services that we provided were legitimate medical services, legitimate, reasonable medical services that the companies would have had to have paid for, except for the fact that we weren't owned by doctors. So the insurance company didn't have to pay the bills submitted by the clinics, because the clinics, under New York law, didn't qualify to be able to seek reimbursement for their services. That's true. Pull the microphones closer to you, Mr. Donovan, because you and I are closer in age than you might think. And my hearing, I don't know if you have bad hearing, but I do. Me too. And I have hearing aids, and I'm still struggling a little bit. So yell at me, and I won't be offended in the slightest. One of the advantages of that, sir, is if you ask me a question I can't answer, I'll just pretend I didn't hear it. You sound like one of my clerks. But that question is different from the question of under the Victim Witness Restitution Act, whether you have to ‑‑ Did the insurance company pay a bill that it didn't have to pay? Yeah. So they were a victim. And it got some kind of advantage for it? How did they get an advantage for it? They paid a bill that they should not have paid. Now, it may well be that the person, you know, the injured party may be unhappy because now their insurance isn't going to pay for it. But for now, at least, the insurance company paid a bill that it didn't have to pay. That's pretty clear. Let me answer that question by asking you a question. It's a hypothetical question. I don't expect an answer. But suppose I'm angry at the way that the medical profession has gotten a monopoly over these payments. And so I start a nonprofit organization that provides really good, reasonably priced, medically necessary treatment to patients in these situations. At a lot less cost than the doctors do. Okay? I get caught. My nonprofit gets caught for doing it. Yeah. And are you saying that I should have to pay back the insurance companies for all the money? All I can tell you is what Judge Rosenblatt told us in 2005 in State Farm v. Malala, where he, interpreting whether under New York law, whether the payments are appropriately made to a clinic that's not owned, doesn't qualify under the New York no-fall insurance law, and that fraudulently incorporated medical corporations are not entitled to reimbursement. That comes straight from the mouth of the New York Court of Appeals. But there are so many other cases that have been decided not in this specific area, but in which this court and other courts have said, well, no, you've got to figure out what is the real loss to the insurance company. And the loss to the insurance company, where is the loss that they've paid out this money? Suppose every bit of this medical treatment, and this isn't true here because there's a lot of fraud here, but suppose every bit of this was money they would have had to have paid out if these companies had been owned by doctors. They haven't suffered any loss. Well, certainly, I don't understand. It's like an out-of-network doctor. If they paid an out-of-network, if the doctor represented that he was somehow within the network or somehow defrauded, that analogy doesn't work for me, so I'm going to back off on it. But I don't understand. These are providers that weren't entitled to be reimbursed, and there was a fraudulent misrepresentation that they were legitimate providers. So the insurance company paid somebody who was not entitled to be paid. That sounds to me like a fraud. But I'm not claiming that it's not fraud. There was a broken leg, and I would agree with you. It was fixing the broken leg, but the person who got paid wasn't entitled to be paid for by Geico or State Farm. I'm not claiming that it's not fraud. I'm not claiming that this isn't an offense. That's been decided. If you shouldn't get the payments and you get the payments, that constitutes mail fraud. What I'm saying is that the Victim Act, the Victim and Witness Restitution Act, takes a look at the actual losses of the insurance company. And in the hypothetical I've given you where every bit of what they paid for is reasonable medical expenses that they would have had to have paid out anyway, I'm just saying there's no loss under the— Reasonable medical expenses performed by someone that was entitled to reimbursement from the insurance company. No, but what's the insurance company's loss? Just because there's a New York law that tells the insurance company you don't have to— Just because there's a New York law? Right, because that's a New York law, not the Victim's Act. No, it's not a federal law. It's not a federal law that determines how much money victims should get. Well, with all due respect to you, the New York law, I think, has a legitimate interest in deciding how it distributes or who is entitled to reimbursement and who's not. And I do, too, and that's why this is fraud. But federal law has an interest, and you say it all the time in your opinions— Who was defrauded here? Not the insurance company. In the instance in which I've given you, okay, in which— Let's talk about this case. Do you— You don't contest that this verdict should be overturned because— Right. You're just talking about restitution. Right. So who was defrauded here? The insurance companies were defrauded insofar as the payments they made were not for medically necessary treatment. And we know that some of it wasn't and some of it was. Do we know that some of it was? How do we know that? We know because in the plea agreement, the statement of facts that accompanied the plea agreement, there was actually that statement that some of the medical services that were provided were necessary. And then we also know because— The services would have been the ones— They would know whether, if they had done appropriate analysis, and they would know what treatments would have been appropriate. So they could also have identified what offset there would be for any medically necessary services. Well, they did. I mean, you know, what happened in various occasions was there'd be a dispute between the clinics and the insurance company as to how much should be paid and how much was medically necessary. There would be an arbitration, and that would be decided. And the results of those arbitrations were submitted as an—I hate to ask you to do this, but they were submitted as an exhibit to the sentencing memoranda. The reason I hate to ask you to do it is attached to these sentencing memoranda are these huge documents from both the government—it's a lot easier to watch a video than to read those documents. That's why you've got law clerks. I think my point is just that any amounts that you're arguing should be offset would also run into the problem with respect to the settlement issue, that it's your burden, the government argues, to show what the amounts are because it's information in your possession. See, I don't think it's my burden. I think it's the burden of the government acting with the victims to present to the court what their losses actually are. What happened here is all the insurance companies— But if you didn't provide any individualized medical assessment, then any services that were actually necessary were lucky. It was just a coincidence. No, I don't think that's true. I mean, the judge calls it accidental, but no, I think a lot of the medical services that were provided were necessary. These are real people. They're not making up people who were in real accidents. But it's not with regard to their—the services that were provided, I thought, were not tailored to the conditions that the patients came in with. Am I wrong about that? No, that's right. They were prescribed lots of neck-twisting and stuff like that that they didn't need. But some of it was. Some of it was. These were real people who were in real accidents who got real medical treatment. And so, I mean, we differ on the burden of proof. What they say is, oh, we just show you how much money was paid to these clinics. Now it's up to you to show us which money they should have received because of legitimate medical treatment. We say, no, no, you've got to submit proof of medical treatment that shouldn't have been received. So we differ as to burden of proof. But I'd also say that they were attached to his sentencing memorandum all kinds of information concerning legitimate treatments. Now the problem is that neither the government nor his submissions, as a district judge, you'd be sympathetic to this. It's a huge job trying to go through that, trying to figure out how much is legitimate and how much isn't. My red light is on. You've reserved some time for us. I don't have much more to say anyway. Thank you, counsel. We'll hear from the government. Thank you, Your Honor. May it please the Court. Ryan Allison for the United States. I represent the government on appeal, and I did so in the district court. Judge Gardefee properly entered a restitution order for the full losses of Israelov's fraudulent scheme inflicted on the victim insurance companies, and Israelov failed to carry his burden to show that he was entitled to a credit against those losses. I think just skipping straight to the substantive issues that were addressed in oral argument today, there's really two ways to think about this medically necessary services issue. The first I described as more of a legal issue, and the second is more of a factual issue. So the legal issue is, is this court going to follow the line of Triana, Jones, and Dehon and say, consistent with those cases, that all of the money that's paid pursuant to this fraudulent scheme is compensable, or whether Mr. Israelov, who wasn't entitled to a cent of payment from the insurance companies, should nonetheless get to keep some of the money he got from the insurance companies because, as you said, Judge Park, there was accidentally they happened to come across some medically necessary services. The second more factual issue is whether, on this record, Mr. Israelov carried his burden, which certainly is his, to establish that the amount that he should be credited against the insurance companies' losses. So I'll just start with the legal issue, which is in this sort of fraudulent certification circumstance, the circumstance that's presented in Triana, presented in Jones, presented in Dehon, whether all of those losses are, in fact, losses, or whether somebody who's fraudulently certifying gets to keep some of the money they fraudulently obtained because somebody somewhere might have had to pay that money to a different insurance company, to a different medical provider in a different circumstance. So this is a case where, of course, fraud pervaded the scheme from soup to nuts from the very beginning to the end. Israelov and his co-conspirators engaged in fraud and bribery to funnel patients to the clinics. They perpetrated more fraud when the patients showed up at the clinics and the doctors prescribed the same thing over and over and over again. So at what point, under your argument, does the burden shift to the other side to prove the offset as opposed to you? I understand you have the total, and then I'm a little bit fuzzy what happens after that. That's right, Your Honor. So we have the total to the extent that Mr. Israelov is asking for credit for services that his clinic provided. That's when the switch happens. That's what this court said in Smathers. That's what it recently said in the Fishbein summary order that's issued in 24-472 on January 26th. That makes some sense to me when he would have the information, the ability to make that calculation or those calculations. But what about a situation where, I'll jump to the settlements part of it, the private settlements. He wouldn't know what other third-party settlements amounts are to offset any windfall that insurance companies might be getting, right? I guess that's right, Your Honor, although he was claiming credit principally for settlements that he himself was a party to. No, I understand that, and under Smathers. But what about to the extent that there were third-party settlements? How would he even know that? Well, he's joined in several liable for the restitution payments with Alexander Golkarov and Peter Kaimov and other folks who were sued by the insurance companies, and so it can be credited against the obligation that way. Not all three of them are going to be paying $46 million. They're going to be adding up to $46 million total. So particularly in a circumstance of medically necessary treatments, this case is a little bit difficult because you have to assume that Israelov actually was the owner and operator who knew what he was doing, but that's what he said he was when he was committing the fraud, right? So if he's the owner and operator in possession of the documents and the records with connection to the doctors and whoever else the employees of the clinics were, he can prove whether the services are medically necessary or medically unnecessary because he has access to his own records. We obtained a large number of them through search warrants and subpoenas in various ways, but Mr. Israelov is the person who had the custody of the records, he and his co-conspirators, and those are the folks who could deduce that evidence to prove whether the treatments were medically necessary or not. And the truth is, as you said, Judge, the extent there was anything medically necessary here, it was basically random. If you look at the evidence that my colleague points to, the attachments to the sentencing submissions, particularly the attachment to Roman Israelov's sentencing submission, Exhibit P is the only document that Roman Israelov has ever submitted to any court that purports to value medically necessary services. If you add up all of the supposedly medically necessary services on this Exhibit P, it adds up to $41,000, a $46 million scheme, right? So we're talking about 0.09% of the money that was paid to the victim insurance companies, paid to the defendants as part of this scheme. 0.09% of it, at most, under his own facts, are medically necessary. That's the factual support for Judge Gardefee's well-grounded finding that everybody's coming in, everybody's getting the exact same list of services. And then, maybe, by accident, you happen across somebody who has a sprained ankle and who needs treatment for the sprained ankle. Well, I suppose he could have said, you know, everyone could benefit from this type of acupuncture, and so maybe as a category they should be offset the amounts that were paid. Well, that's not what the no-fault insurance scheme is designed to compensate. No-fault insurance isn't designed to support the acupuncture industry and say everybody could benefit from acupuncture. It's supposed to be payment for medical services that are medically necessary to treat. There has to be certification that the cause of the injury is the automobile accident. Anytime one receives medical treatment for it, the billing aspect of the physician's office has to certify the causal relationship. That's exactly right, and the reason for that is pretty clear. It's not just a paperwork component. It's not just checking a box. There's a really important reason why these certifications are necessary. It's because the scheme, the statutory scheme that the state set up, is designed to make quick payments to victims of motor vehicle accidents so their insurance covers their injuries quickly. And when you're doing quick payments like that, there are going to be a lot of nefarious actors who are committing fraud because it's easy to get money through a fraudulent way if fewer questions are being asked by the insurance companies. So as a backstop for all of that, you've got doctors, their ethical obligation to only provide medically necessary care. That's what New York State is relying upon, and it's that distinction, the reliance on the doctor's ethical obligations that the defendants exploited. And they exploited it for every single insurance claim that could possibly be submitted in this case, every single one by definition. That's why cases like Triana and Jones and Dehan, that's why they all recognize that maybe, even if you could have maybe paid some legitimate doctor for some legitimate service that was provided, that doesn't count when from the very beginning, from the foundational inception of your clinic or the services that you're providing, you've committed fraud because you're lying about your licensing and your qualifications to do so. So, you know, that's sort of, as I said, the Triana-Jones-Dehan line of cases, that's where I think you can resolve this case. You can also just as easily resolve it by saying that Mr. Israel obviously didn't carry his burden, which Smathers and Fishbein clearly established was his, because at most, as I said, he's got $41,000 of medically necessary services for a $46 million restitution amount. Can I ask briefly about presence and sentencing? Sure. So, you know, restitution is part of the criminal sentence. It's supposed to be present at your sentencing. Why doesn't Rule 43 in this situation? It seems like because you postponed part of it, it somehow is a sort of loophole, and I'm just wondering how to square that. Sure, Your Honor. So I think it's really in the statutory text of 3664C. That's the statute that defines the procedures that are applicable to restitution, and that statutory text specifically lists the statutes and the rules of the Federal Rules of Criminal Procedure that apply to restitution proceedings, and it lists Rule 32C among other statutes, and it specifically, it doesn't list Rule 43. So it's not, so Rule 43 is not incorporated into the statutory scheme that Congress created to set the procedures for restitution. And also, just remember, for this case, of course, this is on a plain error review. It was very clear from at the sentencing that the government was going to seek 90 days to try to get its affairs in order in terms of determining the exact amount of restitution that the victims were entitled to. Judge Gardefee reduced that amount, required the government to submit papers within 30 days, and then set a briefing schedule. I mean, at no point did this realist say, you know what, I gotta make sure that we're there in person. And in fact, I see my red light is on just to finish the answer, Your Honor. 3664 sets up an ongoing scheme of reimbursement, so even tomorrow, if additional victims learn, reasonably learn, that they have additional injuries as a result of this scheme, they can submit for more reimbursement because the point is to compensate them for the scheme. So it's not part of the statutory scheme that Congress set up. Thank you, Your Honor. Thank you, counsel. We'll hear rebuttal. One of the nice things about doing rebuttal is you get a chance to think about things you wish you had said during the initial argument. And I was thinking about Your Honor's point concerning New York law. New York law says this, and we have to respect New York law, and my point that New York law doesn't control what the, I can't hear you. That New York law doesn't control what the Victim and Witness Restitution Act provides. And I was thinking of, since briefs have been filed, the government has sent you a letter informing you about a case called James that accepts the proposition generally that the amounts of restitution should be reduced by the legitimate services that were provided. In that case, it wasn't like this case in the sense that there was a no-fault statute, but it was talking about a case in which I think they had patients who had actually received real treatment, but then they continued to keep getting payments on behalf of patients for whom they were no longer treating. And the court, the district court, had ordered all of the payments should be paid in restitution, and this court said, no, no, it's only those fraudulent ones, not the ones for real payments, and sent it back for recalculation. Well, that was a violation of New York law. Maybe not a statute, but it was a violation of New York fraud law. And so, you know, that's just an observation. My brother's made a bunch of other points. I guess I should just rely on my brief with respect to that. It seems to me if the government's going to ask for 90 days, to continue the sentencing for 90 days so that they can get their figures together, the defendant doesn't waive the right to be present at the final determination as to what the amounts should be. You know, my brother talks about how unpersuasive the documents that we presented in the sentencing memoranda were. Well, that could have been all hashed out during the course of the hearing. If they're unpersuasive, if they're not legitimate, then that could have been hashed out then. Anyway, for all of those reasons, I hope that you will reverse the judgment of the district court and send it back for a recalculation of the restitution. Thank you. Thank you, counsel. Good to see you again, Mr. Dodd. Thank you both. We'll take the case under advisory. And that concludes our arguments for today, so I'll ask the court to adjourn.